UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONALD E. PINES,

     Plaintiff,

vs.                                                                        Case No. 10-15106

BOARD OF REGENTS OF THE                                HON. AVERN COHN
UNIVERSITY OF MICHIGAN,

     Defendant.

_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 14)
## AND DISMISSING CASE[1]

### I.  Introduction

This is an employment case.  Plaintiff Donald E. Pines (Pines) is suing defendant

the Board of regents of the University of Michigan (the University) claiming he was

terminated in retaliation for complaining about a female co-worker, in violation of Title

VII of the Civil Rights Act of 1964.[2]

Before the Court is the University's motion for summary judgment, arguing that

Pines has failed to establish a prima facie case because (1) some of the alleged actions

do not constitute adverse employment actions and (2) Pines cannot establish a causal

---

[1]Although originally scheduled for hearing, the Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

[2]Pines stipulated to dismiss his claims under the Americans with Disabilities Act, Persons with Disabilities Civil Rights Act, and Elliot-Larsen Civil Rights Act.  See Doc. 11.

connection between the protected activity and his termination.  The University also argues that summary judgment is appropriate because he has failed to show that the University's reason for terminating him was a pretext for retaliation.  For the reasons that follow, the motion will be granted.

## II.  Background

The material facts as gleaned from the parties' papers follow.[3]

### A.  Pines' Employment Generally

Pines began working for the on January 8, 2007 as a part-time employee at the University's Department of Psychiatry.  Ten months later, on November 26, 2007, the University offered Pines a regular full-time position as Senior Billing Clerk/Patient Account Representative (Senior Account Representative).  As a Senior Account Representative, Pines had four primary duties:  (1) answer phones; (2) call insurance companies to enquire about the benefits of particular patients; (3) track deposits; and (4) perform batch entries.  Pines began his Senior Account Representative position on a six-month probation period, which ended on May 27, 2008.

On July 7, 2008, just over a month after his probation period ended, Pines informed the University's Director of Operations, Annmarie Lucas (Lucas), in an email that he was unhappy with his job, stating in part:  "I want to bid on the job downstairs with Intake.  To be honest, I am not that happy up here and there is no chance that is

---

[3]The University complied with the Court's motion practice guidelines for a motion for summary judgment.  The University prepared a statement of relevant facts in separately numbered paragraphs, (Doc. 13).  Pines did not respond or prepare a counter-statement.  Under the Court's guidelines, the University's factual statements, which are supported by record citations, are deemed admitted.  As such, they form the basis for the majority of the factual background section of this memorandum.

going to change"  Lucas forwarded Pines' email to his immediate supervisor, Tammy

LaPrell (LaPrell), who responded in an email to Lucas which stated in part:  "we've had

no inclination that [Pines] was dissatisfied until now"

    LaPrell then spoke with Pines to find out why he wanted to leave the

department and reported back to Lucas in an email, stating in part:

> I . . . spoke with [Pines] and he said that the Patient Rep position
> is just not a good fit for him.  Nothing else.  He is very stressed and
> would like to move on.  At that point I spoke to him about the
> Nueropscyh. position and he actually sounded very interested.  I
> gave him the posting number and he said he would pop on it.  I
> also told him that the three of us would be talking no later than
> Wednesday and would get back to him.  He seemed somewhat
> releaved [sic].

### B.  Pines' Harassment Complaint

    That same day, July 7, 2008, Pines met with Lucas.  During the meeting, he

explained that Hilary McGraw (McGraw), a co-worker, was stalking him.  In particular,

Pines reported the following incidents of "harassment:" (1) when his wife (who also

worked at the University) was in his office, McGraw banged things so he could hear and

that he felt he was being sexually harassed; (2) McGraw followed him around; (3)

McGraw made him feel uncomfortable; and (4) on one occasion McGraw had given him

a Valentine's Day card and candy.

    While Pines testified at deposition that he was not sure he gave all of the details

to Lucas, he now alleges that (1) McGraw made him uncomfortable because she asked

for his phone number, although he admits that he does not know why she wanted it and

that he never actually received a call that he knows came from McGraw; (2) he threw

the Valentine's Day card away without reading it, so he has no idea whether it said

3

anything other than McGraw's name or was sexual in any way; and (3) McGraw did not

say anything sexually suggestive to him regarding the card.  Pines also explained in his

deposition that the allegation that McGraw "followed" him is based on the fact that he

frequently encountered her as he went about his business in the office and that McGraw

accompanied Pines when he delivered money to another department – as she

was required to do.  Pines also now alleges that McGraw ate a sucker "suggestively,"

wore low-cut tops, and said that if they had a baby, they could name it Destiny.  Pines

also admitted at deposition that any alleged sexual harassment had ended by July 8,

2008, the day after he first made his complaint.

> After making his complaints to Lucas, Pines requested to be moved to a different
> position, suggesting that he would like to bid on a position in Intake.  Lucas told Pines
> she would investigate his complaints

> To that end, on July 16, 2008, Human Resources Consultant Patricia Whitfield
> (Whitfield) outlined the investigation process Human Resources would conduct with the
> assistance of David Betts (Betts) of the University's Office of Institutional Equity (OIE).
> As part of the investigation, Betts interviewed Pines, McGraw, and other coworkers.
> During his deposition, Pines stated that he may not have provided all of the details
> regarding his current allegations when he met with Betts, which took place on July 17,
> 2008.

> During McGraw's interview with Betts, McGraw denied Pines' allegations and
> made a counter-complaint, indicating that Pines (1) told her he liked her breasts; (2)
> would stare at her breasts;(3) would stand unnecessarily close to her; (4) attempted to
> engage in sexual conversation, asking, among other things, for her to explain her online

4

dating and sexual experiences; (5) would play the Marvin Gaye song "Let's Get It On" while dancing in a sexually suggestive manner; and (6) would simulate sexual intercourse with McGraw's chair, the office wall and a toy frog McGraw kept in her office.  However, McGraw did not provide specific dates or times of such incidents.  She also reported that sometimes Pines comments led her to tell him he was giving "too much information," she did not tells Betts that Pines' conduct was unwanted or unwelcome.  McGraw also told Betts that on occasion her conversations with Pines became sexual in nature, and that she had willingly participated in the conversations.

Betts also interviewed other witnesses who corroborated some of McGraw's complaints but did not corroborate Pines' allegations against McGraw.  In his affidavit, Betts states that within a few weeks of beginning his investigation, he concluded that McGraw did not sexually harass Pines, but that both McGraw and Pines acted unprofessionally on several occasions.  However, due to the fact that McGraw had made a counter-complaint, Betts delayed issuing a final report because he wanted to speak with Pines.  As will be explained below, however, Betts was unable to do so because Pines went on medical leave a few weeks after he reported the alleged harassment.

On September 15, 2008, LaPrell gave Pines a written warning for inappropriate and unacceptable behavior based on "information indicating a pattern that you occasionally initiated conversations that were inappropriate and should not have occurred in the work setting"  Because witnesses did not corroborate Pines' allegations against McGraw, LaPrell issued her a verbal warning.  LaPrell states in her affidavit that the discipline decisions were made based on Betts' statements to her regarding his

5

initial findings.

On January 26, 2009, Betts issued his final report,[4] finding neither Pines nor McGraw had violated the University's sexual harassment policy, but that both had acted unprofessionally.

### B. Pines' Medical Leave and Performance Issues

Meanwhile, on July 28, 2008, a few weeks after he made his complaint about McGraw, Pines went out on medical leave. Pines provided a note from Dr. Murtaza Syed which stated Pines was under his psychiatric care and would be unable to work from July 28, 2008 through August 11, 2008. Dr. Syed extended Pines medical leave several times, during which Pines applied for and was granted leave under the Family and Medical Leave Act. Dr. Syed ultimately released Pines to return to work on September 15, 2008, with the restrictions that Pines would need a "gradual return to his workplace for adjusting to workplace," could only work part-time during the gradual return, and would be seen again by Dr. Syed in two weeks.

The University agreed to the doctor's requested accommodations and allowed Pines to return to work on a part-time basis "at 4 hours a day starting September 15, 2008." As noted above, the day Pines returned to work he received the written warning based on Betts' investigation.

Because Pines' work hours were reduced, the University also reduced his workload to three tasks – (1) taking patient representative phone calls; (2) processing requests in the patient representative email inbox and (3) staying current with the batch

---

[4]In the background section of the report, Betts notes that the report was delayed due to both Pines and McGraw "being unavailable for extended periods of time."

entries – in order to help Pines complete the most essential components of his job during his limited time in the office.  Finally, the University changed Pines' office location to separate him from McGraw.

Although he returned to work in mid-September, Pines was absent several times shortly thereafter.  He called in sick nine times between September 15 and November 3, 2008, sometimes without a doctor's note.

On October 3, 2008, LaPrell documented her concerns regarding Pines' attendance and the fact that he had not provided any documentation regarding the need for continued restrictions beyond the two week revisit date noted in Dr. Syed's initial return-to-work release.  LaPrell wrote to Pines:[5]

> On Monday, September 29, I expected that your schedule would return to full-time per Work Connections.  On September 29, you left at Noon without informing me, called in sick September 30 and left at Noon on October 1, and on October 2 and again without informing me that you were leaving for the day.
>
> As of October 3, Work Connections has not received any updated documentation from your medical provider that your part-time work restriction would continue beyond September 29, 2008.  The absences this week will be unexcused without pay.
>
> Your continued absence is causing a negative impact on your productivity as well as the productivity of other staff with the Business Office.  It is causing a hardship on me and my staff in meeting the demands of patient billing.
>
> If additional documentation from Work Connection is not received by October 6, 2008, it may jeopardize continuation of your current position with the Department of Psychiatry.

---

[5]At deposition, Pines denies receiving several notices regarding his performance. However, he admits that his telephone was disconnected and he used his wife's e-mail to conduct business.

7

On October 11, 2008, Dr. Syed continued Pines' restrictions until the end of 2008.

In addition to the attendance issues, Pines had problems completing his reduced tasks.  On October 29, 2008, LaPrell documented these problems in a memorandum to Pines entitled "1st Corrective Action - Work Performance" which states in part:

> My review of your work shows that you have not been meeting
> minimal obligations.  For example, today was your assigned day to
> monitor voice mail and you left without doing it.  The completed
> folder in the shared inbox shows that no messages were processed
> by you since your return to work on September 15.  In addition, we
> continued to fall further behind in batch entry in M-Strides.

In mid-November 2008, LaPrell went through Pines' work and found a number of tasks that were months overdue.  As a result, the University placed Pines on an unpaid medical leave, effective on November 11, 2008.  LaPrell documented the reasons in a November 10, 2008 memorandum to Pines, entitled "Failure to Meet Work Obligation." The memorandum states in part:

> During September 2008, we agreed to support your return to work
> by temporarily providing you with an accommodated work
> schedule.  As a result, you were permitted to alter your normal 40
> hour per week schedule in exchange for a 20-hr. work week where
> you were scheduled to work 4 hrs per day, 5 days per week.
>
> . . . Since your return to work on September 15, 2008, you have failed
> to demonstrate that you are able to sustain yourself on a 20 hour
> per week work schedule.  Since your return 9 weeks ago, with the
> exception of two weeks, you have been unable to meet a work
> obligation of 20 hours per week.  Although we have attempted to
> accommodate your reduced work schedule, your inability to
> regularly contribute 20 hours of work per week, has been
> disruptive to our operational work flow. Your typical work pattern
> has included either 1 or 2 days of no pay for each of the weeks that you
> have failed to work 20 hours. At this time, we are no longer
> able to offer continued reduced work hours.

8

Effective November 11, 2008, we are releasing you from reporting
to work and placing you on an unpaid medically approved leave.
If future health changes enable you to increase your work hours,
please alert me and provide this updated health information to
Work Connections.

On November 13, 2008, Pines provided a medical statement from his doctor.

The statement is of poor quality and difficult to read. However, it appears that his doctor

stated: "[Pines] feels harassed at work. As long as he is exposed to what he feels are

caustic co-workers he will have difficulty performing any work." The doctor states Pines

will be evaluated weekly and appears to give a return to work date of February 13,

2009. Thus, Pines' doctor's note essentially confirms he was unable to work.

On December 3, 2008, the University advised Pines of the return-to-work

process,[6] stating in part:

---

[6]At the time Pines was on unpaid medical leave of absence, the University's
leave of absence policy stated in part:
I. Policy
Leaves of absence are without compensation by the University
except as provided by the University Disability Plans…Staff
members returning from initial…medical…leaves of absence will
be assigned to their former classifications or classification or like status and pay
for which they are qualified; unless their circumstances or the circumstances of
the University have changed, making this unreasonable.
　　　* * *
II. J. Failing To Return From A Leave
Failure to report for work at the conclusion of a leave without
requesting and receiving an extension of the leave will be cause for
termination of the staff member's employment with the University.
* * *
III. B. 1. Procedures-Returning From Leave-Staff Member
Two weeks before the date that the leave expires, [staff members]
must notify the appropriate Personnel Service Center Employment
Office of [their] intent to work. If returning from a medical leave,
provide a medical leave release from a physician.
III. B. 2. Procedures-Returning From Leave-Personnel Service Center
Employment Office

9

You have been granted an unpaid personal leave of absence not covered under the FMLA.  The leave began on November 11, 2009 and will end on May 11, 2009.
. . .

This will be your only notice regarding your leave of absence.  It will be your responsibility to contact your department at least 14 days prior to your return to work.  If you do not contact your department to make arrangements to return, your reemployment with the University of Michigan may be terminated.

On December 6, 2008, Pines' new doctor, Ravi Kirbat, M.D., released him to return to work, without restrictions, effective December 17, 2008.

Pines, however, did not contact anyone at the University regarding his return to work and did not appear for work on December 17, 2008.  Rather, it was not until three months later, in March 2009, that he contacted the University about returning to work.

C.  Pines' Position at the University

While Pines was on his medical leave, but after his physician released him to return to work as of December 17, 2008, the University decided that it did not need a Senior Account Representative position and eliminated the position.  After deciding that it could effectively operate with a lower position, the University created a new, reduced position that included some, but not all, of Pines job functions, which it filled in December 2008.

---

If a returning staff member's former position is not available, and there are vacant position of like status and compensation for which the returning staff member is qualified, discuss option a, b, or c with the staff member as they apply:
>     (a) Return the staff member to a vacant position in the department from which the leave was taken.
>     (b) Return the staff member to a vacant position in the organizational group from which the leave was taken;
>     (c) Return the staff member to a vacant position any place in the University

10

On March 16, 2009, more than three months after he was released to

return to work by his physician, Pines emailed Whitfield in Human Resources, stating,

> It has come to my attention that my previous position has been
> filled. I was placed on medical leave under the assumption that I
> would be returning to this position. I have been working with my
> doctor to return to work from medical leave. I have also supplied
> documentation from my health care provider stating that all health
> care restrictions have been lifted as well. The reason I have
> contacted you is that I am hoping that you could provide some
> assistance in securing a new position at the University of Michigan.

Whitfield responded in an email dated March 20, 2009, stating in part:

> Staff members returning from medical leaves are typically considered for
> placement in vacant positions in their former department for which they are
> qualified, if any vacancies exist.  I've checked and have not identified a vacancy
> in your former area and I will therefore be monitoring other areas of Psychiatry to
> determine if other suitable openings occur.
>
> Once you have obtained a release to return to work from your
> treating sources, you should feel free to begin bidding on positions
> online through eMploy. . . .
>
> I am open to meeting with you if you would like to discuss your
> planned job search. You also have the option of forwarding your
> resume/cover letter and I could review it and provide feedback

Whitfield again explained the process to Pines in an another email on April 2,

2009.  After Pines expressed some dissatisfaction with the University's response to his

request to return to work, Whitfield advised him, in an email dated April 6, 2009:

> In one of your previous e-mails you appeared to have concerns
> regarding how your previous position was handled. If that is
> correct, you can always file a grievance and note which actions
> you would like to have reviewed. If you have an interest in doing
> that, let me know and I will mail you a grievance packet along with
> instruction.
>
> If you would like to speak with my Services Director that would be
> Jan Mulcrone and you can request her through our front desk.

11

In April, 2009, Pines submitted a Non-Bargained For Grievance, contending that the University violated "(1) Michigan's Sexual Harassment law; (2) The Michigan Civil Rights Initiative; (3) the Americans With Disabilities Act; (4) Title VII of the Civil Rights Act of 1964; (5) the Whistleblowers Protection Act; (6) Marital Discrimination; and (6) University of Michigan Standard Practice Guide 201.3 Section N, line #1"

Pines was allowed to choose one of the members to sit on the grievance panel. The third step grievance hearing was held on May 18, 2009.  At his hearing, Pines explained that he "certainly [didn't] want to go back [to his former] position, but I needed the money now. I'm desperate. That's what I told them at the grievance. When you're desperate, that's all there is, I would have taken it. I wouldn't have liked it, and I still would have hoped for a transfer. I would have encouraged it."

The University Review Committee found that Pines was not subjected to any unlawful actions.  The Committee, however, agreed to extend Pines' leave until August 11, 2009, so that he would have additional time to find a new position within the University.

Although Pines subsequently applied for positions, he was not selected for any positions for which he applied.  The University says he was not selected because he was not the most qualified candidate.  At deposition, Pines admitted that he has no idea who was ultimately selected for any of these positions or the qualifications of the successful candidates.

Because Pines did not find an alternate position during the extended time period,

12

LaPrell sent him a letter stating he was terminated effective August 1, 2009.[7]

### III.  Summary Judgment

Summary judgment should be granted when the moving party establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 451 (6th Cir.2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "A fact is material only if its resolution will affect the outcome of the lawsuit." Hedrick, 355 F.3d at 451-52(citing Anderson, 477 U.S. at 248).  In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor.  See Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603, 613 (6th Cir. 2003); Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir.2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." Hedrick, 355 F.3d at 451 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).  To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact.  Rather, "the burden

---

[7]As noted above, the Committee extended Pines' leave until August 11, 2009. Thus, his termination should have been effective as of that date, not August 1, 2009. Be that as it may, there is no evidence in the record that Pines would have obtained a new position after August 1, 2009.  Moreover, it is possible that the August 1, 2009 date in the letter was a typographical error.

on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." Celotex Corp., 477 U.S. at 325.  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'  " Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 453 (6th Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); Fed. R. Civ. P. 56(e).  The nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson, 477 U.S. 242, 252.  Thus, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.

IV.  Analysis

A.  Prima Facie Case

Title VII prohibits an employer from discriminating against an employee who opposes any practice made an unlawful employment action under Title VII.  42 U.S.C. § 2000e–3(a).  "In the absence of direct evidence, we review [Pines'] retaliation claim under the McDonnell Douglas framework."  Vaughn v. Louisville Water Co., 302 Fed.Appx. 337, 348 (6th Cir.2008) (citation omitted).

In order to establish a prima facie case of retaliation, Pines must show that: (1)

14

he engaged in a protected activity under Title VII; (2) the University knew he engaged in that protected activity; (3) the University took an adverse, retaliatory employment action against him thereafter, or he was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between his protected activity and the adverse employment action or harassment.  See Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 736 (6th Cir. 2006); Arendale v. City of Memphis, 519 F.3d 587, 606 (6th Cir.2008) (citation omitted).

The University says that Pines has failed to make out a prima facie case because (1) some of Pines' alleged discriminatory employment actions do not constitute adverse employment actions and (2) Pines cannot show a causal connection between the protected activity and his termination.  Each argument is addressed in turn.

In Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), the Supreme Court defined an adverse employment action in the context of a Title VII retaliation claim as one that "a reasonable employee would have found ... materially adverse, which in this context means [that the action would] dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."  The Supreme Court cautioned that "it is important to separate significant from trivial harms."  Id.  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Id.

Here, the University concedes that Pines' termination was an adverse employment action.  While that would seem to end the matter insofar as to this element of a prima facie case, the University goes on to argue that Pines' alleged instances of

15

adverse employment actions, including (1) having his office location changed, (2) never feeling part of the group, (3) never being handed his disciplines, and (4) his supervisor allowing him to perform only a portion of his duties after initially returning from medical leave, are not actionable.  The Court agrees.  None of these alleged action would dissuade a reasonable person from filing a sexual harassment complaint.

Pines, however, argues in his response that his four instances of discipline constitute adverse employment actions.  Pines is mistaken.  First, while the September 15, 2008 written warning is disciplinary, it informs Pines that his behavior was inappropriate and unacceptable and does not impose significant corrective action. Second, the October 3, 2008 letter is not disciplinary at all.  Rather, it informs Pines as to the effect of absences without documentation.  Third, the October 29, 2008 memorandum advises Pines that there are concerns with his performance but does not impose any discipline on him as a result.  Finally, the November 10, 2008 memorandum is not disciplinary.  In that letter, the University informs Pines that because he has been unable to meet his work schedule obligations, he will be returned to medical leave.  As noted above, Pines responded to that memorandum with a  doctor's note indicating that he could not work at all.

Based on the record, consisting of one written warning, a written counseling regarding performance improvement, a letter advising Pines of a need for medical documentation, and being placed on medical leave (which his doctor confirmed his inability to work at that time), reasonable minds could not differ that these events are insufficient to dissuade a reasonable employee from making a charge of discrimination. Thus, they do not constitute adverse employment actions.

16

The University also argues that Pines has failed to make out a prima facie case because he cannot show a causal connection.  The University notes that Pines filed his complaint on July 8, 2008 and was not terminated until at least August 1, 2009–more than a year later.  "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008); see also Randolph, 453 F.3d at 737 ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."); Little v. BP Exploration & Oil Co., 265 F.3d 357, 363–64 (6th Cir.2001) ("While it is true that temporal proximity alone is insufficient to establish a causal connection for a retaliation claim, there are circumstances where temporal proximity considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection." (internal citations omitted)).

Here, Pines has offered no evidence as to causal connection, i.e. that any of his alleged "disciplines" (assuming they were adverse employment actions) or his termination were the result of his sexual harassment complaint.  Instead, Pines argues that the complaint and his termination are not over a year apart, but rather only 91 days apart because he only worked that many days between the two events.  Pines offers no authority for the proposition that actual days worked, as opposed to the number of days which elapsed between the relevant events, is controlling.  Moreover, the Sixth Circuit appears to have rejected this type of argument.  See Martin v. General Electric Co., 187

17

Fed. Appx. 553, 561 (6th Cir. 2006) (counting total elapsed days between the filing of plaintiff's EEOC charge and adverse employment action, and not days plaintiff worked). Moreover, 91 days by itself does not establish a causal connection.  Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999) (affirming dismissal of claim where disciplinary action occurred two to five months after alleged protected activity).

Even if Pines could establish temporal proximity, he has not pointed to any other indicia of retaliatory conduct.  See, e.g., Randolph, supra, at 737.  Instead, he says that "after going on a medical leave…plaintiff was never allowed to return [to work]. The plaintiff was offered a settlement on June 16, 2009."  (Doc. 16, Pines' Response brief at p. 8).  However, Pines does not dispute that his doctor released him to return to work as of December 17, 2008 and he failed to show or make arrangements for his return until three months later.[8]  Finally, the offer of a separation agreement does not establish retaliation.  See EEOC v. SunDance Rehabilitation Corp., 466 F.3d 490 (6th Cir. 2006).

Overall, Pines has failed to establish a prima facie case of retaliation.

## B.  Pretext

Assuming Pines established a prima facie case of retaliation, the burden of production then shifts to the University to proffer a non-discriminatory reason for the adverse employment action.  Ladd v. Grand Trunk Western R.R., Inc., 552 F.3d 495, 502 (6th Cir.2009) (citation omitted).  Once the University does so, "the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was mere

---

[8]Pines does not dispute that he failed to return to work after his doctor cleared him to do so, nor does he explain why he waited three more months before contacting the University about returning to work.

pretext." Id. The burden of persuasion, however, remains at all times with the Pines. Id.

Here, because the University has stated a non-discriminatory reason for Pines' termination–his position was no longer available when he attempted to return to work from a medical leave of absence within the initial, and extended, period of time the University allowed him to seek an available position. Pines must now show this reason was pretextual. In order to prove pretext, Pines must show that the University's reason(s) "(1) had no basis in fact, (2) did not actually motivate its conduct, or (3) were insufficient to warrant the challenged conduct." Browning v. Department of the Army, 436 F.3d 692, 695 (6th Cir. 2006).

Pines argues that pretext is established because (1) LaPrell did not want him back in her department; (2) the University has never indicated why Pines' position was no longer available; and (3) the University failed to allow him to bump another employee from his/her position. These allegations, none of which are supported by any evidence, are sufficient to show pretext. Pines' allegation concerning LaPrell does not show pretext because he offers no facts to show that LaPrell wanted him out of her department. Speculation does not establish pretext. Pines' allegation regarding the availability of his position also fails to show pretext. Pines has no evidence to rebut the University's contention that it could operate effectively with a lower position. Pines' allegation regarding bumping to another position also misses the mark. When Pines finally sought to return in March 2009, three months after his physician released him to do so, the University says that he was no longer entitled to the protections of the

University's Standard Practice Guide (SPG) which apparently allows for bumping.[9]

Pines offers nothing to contradict this assertion. Overall, Pines has not shown that the

University's actions with respect to him, up to and including his termination, were a

pretext for retaliation.

## V. Conclusion

For the reasons stated above, the University's motion for summary judgment is

GRANTED. This case is DISMISSED.

SO ORDERED.


Dated: February 6, 2012                  s/Avern Cohn
                                         AVERN COHN
                                         UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of
record on this date, February 6, 2012, by electronic and/or ordinary mail.


                                         s/Julie Owens
                                         Case Manager, (313) 234-5160

---

[9]The University argues that even if Pines had been entitled to the SPG's
protections – as they existed in the July 2009 version of the leave of absence SPG – an
individual under that version of the SPG was only entitled to bump another employee "in
the same classification…provided the employee [can] do the work and has more service
than the staff member with the most recent date of hire." Pines has not identified any
existing employee in his classification with less seniority than him or shown that he had
the ability to do that unidentified person's work.